1   THE MATHEWS LAW GROUP
    CHARLES T. MATHEWS (SBN 55889)
2   GEORGE S. AZADIAN (SBN 253342)
    2596 Mission Street, Suite 204
3   San Marino, California  91108
    Phone: (626) 683-8291
4   Fax:    (626) 683-8295
    Ted@ctmesq.com
5   George@ctmesq.com

6   Attorneys for Plaintiff
        CLAUDIA JOHNSON
7

8

                    UNITED STATES DISTRICT COURT
9
                   CENTRAL DISTRICT OF CALIFORNIA
10

11  CLAUDIA JOHNSON, on behalf of       CASE NO.  11-CV-03590-PA (JCx)
    herself and all others similarly
12  situated,                           **PLAINTIFF'S JOINT
                                        OPPOSITION TO DEFENDANT'S
13                  Plaintiff,          MOTION TO DISQUALIFY AND
                                        MOTION TO STRIKE**
14          v.
                                        Hearing
15  WELLS FARGO DEALER                  Date:    July 11, 2011
    SERVICES, INC., formerly known      Time:    1:30 p.m.
16  as WACHOVIA DEALER                   Crtrm:   15
    SERVICES, INC.
17                                      [Request For Judicial Notice and
                    Defendant.          Declaration of Charles T, Mathews filed
18                                      concurrently; Declaration of George S.
                                        Azadian filed under seal pursuant to L-R
19                                      79-5]

20

21

22

23

24

25

26

27

28

───────────────────────────────────────────────

**PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY
AND MOTION TO STRIKE**

## **TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................1

II.   FACTUAL BACKGROUND.................................................2

    A.    The Relevant Entities...............................................2

    B.    The Student-Loan Action Against Bank-Sub....................3

    C.    The Pennsylvania Action And The Filing Of The Cell-Phone Action Against Dealer-Sub...........................................4

    D.    The Malta/Hopkins Actions Against Wells Fargo Home Mortgage, Inc........................................................6

III.   DEALER-SUB'S MOTION TO DISQUALIFY MUST BE OVERRULED...............................................................7

    A.    Legal Standard On A Motion To Disqualify......................7

        1.    Determining Whether The Attorney Owes A Duty Of Loyalty................................................7

        2.    Determining Whether A Conflict Of Interest Exists.......8

    B.    Dealer-Sub And Bank-Sub Should Not Be Treated As A Single Entity For Conflict Of Interest Purposes...............…..........9

        1.    The Cases Relied On By Dealer-Sub Involve A Parent And Its Wholly Owned Subsidiary – Not Distant Subsidiaries Of A Massive Holding Company...........10

        2.    Fatal To Dealer-Sub's Motion, The Cell-Phone Action Against Dealer-Sub Will Not Result In Any Financial Impact To Bank-Sub.......................…..................11

        3.    Merely Sharing The Same Legal Department Does Not Give Rise To A Unity Of Interest..........................13

4.     Dealer-Sub Also Fails To Satisfy The Alter-Ego Exception..................................................14

C.   Even If Bank-Sub and Dealer-Sub Are Improperly Treated As A Single Entity, There Is No Conflict Of Interest...............15

1.     Dealer-Sub Attempts To Impermissibly Impute Conflicts Of Other Attorneys At Counsel Azadian's Former Firm........................................................15

2.     The Student-Loan Action And Cell-Phone Action Lack The Necessary "Substantial Relationship"................17

IV.   DEALER-SUB'S MOTION TO STRIKE IS BASED ON MISGUIDED EVIDENTIARY OBJECTIONS AND MUST BE OVERRULED........................................................18

V.   CONCLUSION & REQUEST FOR EXTENSION BASED ON DEALER-SUB'S DELAYING TACTICS..............................19

# TABLE OF AUTHORITIES

CASES                                                                      PAGE(S)

*Adams v. Aerojet-General Corp.*
86 Cal. App. 4th 1324 (2001) ……………...………………1, 11, 15, 16, 19

*Anderson v. The CBE Group*
No. 11-cv-245, 2011 U.S. Dist. LEXIS 42334 (N.D. Cal. Apr. 18, 2011)
……………………………………………………………………….18

*Brooklyn Navy Yard Cogeneration Partners, L.P. v. Superior Court*
60 Cal. App. 4th 248 (1997) ……………………………………………...14

*Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*
264 F. Supp. 2d 914 (N.D. Cal. 2003)…………………………..8, 10, 11, 12, 13

*Faughn v. Perez*
145 Cal. App. 4th 592 (2006) …………………………………8, 4, 9, 13, 15, 17

*Germain v. J.C. Penney Co.*
No. 09-cv-2847, 2009 WL 1971336 (C.D. Cal. July 6, 2009) …………….……..18

*Jessen v. Hartford Cas. Ins.*
111 Cal. App. 4th 698 (2003) …………………………………………...9

*Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*
69 Cal. App. 4th 223 (1999) ……………………………...4, 7, 8, 10, 11, 12, 13, 14

*RDF Media Ltd. v. Fox Broadcasting Co.*
372 F. Supp. 2d 556 (C.D. Cal. 2005)………………………………………1, 19

*Santa Teresa Citizen Action Group v. City of San Jose*
114 Cal. App. 4th 689 (2003)………………………………………….9, 17

# I.    INTRODUCTION

In the above-captioned action (the "Cell-Phone Action"), plaintiff Claudia Johnson ("Plaintiff") alleges that defendant Wells Fargo Dealer Services, Inc. ("Dealer-Sub") has violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq., ("TCPA") by placing autodialed calls to Plaintiff's cellular phone for a debt she does not owe.  Instead of addressing Plaintiff's allegations on the merits, Dealer-Sub has repeatedly delayed this action, which was originally filed in January, 2011.  Dealer-Sub's latest delaying tactic consists of the two motions (the "Motion to Disqualify" and "Motion to Strike") before this Court.[1]  For the reasons discussed below, both motions completely lack merit and must be overruled as a matter of law.

First, Dealer-Sub's Motion to Disqualify borders on absurd by contending that there is an "ethical snafu"[2] due to Counsel Azadian's prior representation, of a completely unrelated entity, Wells Fargo Bank, N.A. ("Bank-Sub") in an action regarding capitalization of interest on federal student loans (the "Student-Loan Action").  Counsel Azadian's representation of Bank-Sub lasted four-month, resulted in a settlement that was finalized prior to any Answer or dispositive motion being filed, did not involve the TCPA in any manner whatsoever and was completely unrelated to the activities of Dealer-Sub.  Moreover, Bank-Sub is a separate legal entity who cannot be held liable for the actions of Dealer-Sub.  Despite these facts, Dealer-Sub argues that a conflict of interest exists because Bank-Sub and Dealer-Sub —along with the other 1,580 subsidiaries of Wells

---

[1] See Adams v. Aerojet-General Corp., 86 Cal. App. 4th 1324, 1339-1340 (2001) ("as courts are increasingly aware, motions to disqualify counsel . . . can be misused to harass opposing counsel [citation], to delay the litigation . . . it is widely understood by judges that attorneys now commonly use disqualification motions for purely strategic purposes"); see also RDF Media Ltd. v. Fox Broadcasting Co., 372 F. Supp. 2d 556, 561 (C.D. Cal. 2005) ("Motions to strike is generally disfavored because of limited importance of pleadings in federal practice and because it is usually used as delaying tactic").

[2] (Declaration of Eric J. Troutman ("Troutman Decl.) ¶ 4.)

**PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY AND MOTION TO STRIKE**

1    Fargo & Company ("Holding Corp")— share the same legal department.  Thus,

2    according to Dealer-Sub, an associate who works on a single action for a

3    subsidiary of Holding Corp is prohibited, even after joining a new firm, from being

4    adverse the other 1,581 subsidiaries in a completely distinct action.

5        Second, in lieu of a responsive pleading or dispositive motion, Dealer-Sub

6    has filed a frivolous Motion to Strike the "Internet postings" quoted in the

7    Complaint.  Dealer-Sub filed the Motion to Strike despite the fact that courts have

8    denied nearly identical motions to strike Internet postings.

9        Finally, due to Dealer-Sub's repeated delaying tactics, Plaintiff respectfully

10   requests a 90-day extension on the deadline set by Local Rule 23-3 for the filing of

11   Plaintiff's Motion for Class Certification.

12                          **II. FACTUAL BACKGROUND**

13   **A.    The Relevant Entities**

14       As disclosed in its Annual Report filed with the Securities and Exchange

15   Commission, Holding Corp is a massive shell company that "through subsidiaries

16   engage[s] in various businesses, principally: wholesale banking, mortgage banking,

17   consumer finance, equipment leasing, agricultural finance, commercial finance,

18   securities brokerage and investment banking, insurance agency and brokerage

19   services, computer and data processing services, trust services, investment

20   advisory services, mortgage-backed securities servicing and venture capital

21   investment."  (Request for Judicial Notice ("RJN"), Ex. A at p. 5.)  As of

22   December 31, 2010, Holding Corp wholly or partially owned 1,582  subsidiaries.

23   (Id., Ex. B.)  Holding Corp divides its subsidiaries into two broad categories:  (1)

24   "Subsidiary Banks"; and (2) "Nonbank Subsidiaries."  (Id., Ex. A at p. 7.)  Two of

25   Holding Corp's 1,582 subsidiaries are Bank-Sub (a Subsidiary Bank) and Dealer-

26   Sub (a Nonbank Subsidiary).  Dealer-Sub has not argued or provided any facts

27   indicating that there is any relationship whatsoever between Bank-Sub and Dealer-

28   Sub, other than the fact that all of Holding Corp's 1,582 subsidiaries share the

**PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY
AND MOTION TO STRIKE**

1  "Wells Fargo Legal Department."  (Declaration of Shannon D. Gausman

2  ("Gausman Decl.") ¶ 2.)

3  **B.      The Student-Loan Action Against Bank-Sub**

4      On February 3, 2010, a putative class action was filed against Bank-Sub,

5  alleging that Bank-Sub breached the "interest capitalization provisions of the

6  federal student loans that it makes." (Def's RJN, Ex. 1 at ¶ 1.)  More specifically,

7  the complaint alleged "promissory notes itemize the circumstances under which

8  [Bank-Sub] may capitalize interest, but its practice is to ignore those restrictions

9  and capitalize interest in other situations not permitted by the promissory notes."

10  (Id.)  Based on these allegations, the complaint alleged claims for:  (1) breach of

11  contract; (2) violations of the Consumer Legal Remedies Act, California Civil

12  Code section 1750, et seq. ("CLRA"); (3) violations of California's False

13  Advertising Law, California Business & Professions Code section 17500, et seq.;

14  and (4) violations of California's Unfair Competition Law, California Business &

15  Professions Code section 17200 ("UCL").  (Id., ¶¶ 76-103.)

16      On June 18, 2010, just over four months after the complaint was filed,

17  plaintiff in the Student-Loan Action filed a notice of settlement.[3]  (RJN, Ex. C.)

18  Prior to the notice of settlement being filed, the parties advised the court that "by

19  letter dated March 31, 2010, [Bank-Sub] provided to Plaintiff substantive

20  information that it believes may dispose of this action, and Plaintiff is currently

21  considering that information."  (RJN, Ex. D at 1:16-18.)  Bank-Sub never filed an

22  Answer or other responsive pleading in the Student-Loan Action.  (RJN, Ex. E.)

23      The Student-Loan Action was the only matter where Counsel Azadian, in his

24  capacity as an associate for Stroock & Stroock & Lavan, LLP ("Stroock"),

25  represented an entity affiliated with Holding Corp.  Additional facts regarding the

26  [3] Counsel Troutman's declaration misleadingly implies that Counsel Azadian
   represented Bank-Sub until his final day at Stroock.  (Troutman Decl. ¶ 7; see also
27  Mot. at 4:18-20; Mot. at 9:21-22.)  However, the court's docket in the Student-
   Loan Action indicates that plaintiff filed a notice of settlement on June 18, 2010 –
28  nearly a year prior to Counsel Azadian's departure.

**PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY
AND MOTION TO STRIKE**

1    Counsel Azadian's role in the Student-Loan Action are contained in the

2    Declaration of George S. Azadian, which is filed under seal pursuant to Local Rule

3    79-5.[4]

4    **C.      The Pennsylvania Action And The Filing Of The Cell-Phone Action**

5    **Against Dealer-Sub**

6            On January 28, 2011, local counsel retained by The Mathews Law Group

7    filed the complaint entitled, <u>Claudia Johnson v. Wells Fargo Auto Finance, Inc.,</u>

8    No. 11-cv-168 (E.D. Penn.) (the "Pennsylvania Action"). (Declaration of Charles

9    T. Mathews ("Mathews Decl.") ¶ 2.) Counsel Azadian did not join the Mathews

10   Law Group until April 1, 2011. (<u>Id.</u> ¶ 3.) Approximately, three weeks prior to

11   joining The Mathews Law Group, Counsel Azadian provided the firm's Principal

12   ("Counsel Mathews") with the names of the entities that he had represented during

13   his former employment. (<u>Id.</u>) Counsel Mathews reviewed Counsel Azadian's

14   former matters, including Counsel Azadian's representation of Bank-Sub in the

15   Student-Loan Action. Counsel Mathews determined that there was no conflict of

16   interest caused by Counsel Azadian's involvement in the Student-Loan Action

17   because the Pennsylvania Action was alleged against a different entity, Bank-Sub

18   was not implicated by the Pennsylvania Action and the Student-Loan Action was

19   based on completely different legal and factual issues. (<u>Id.</u> ¶ 4.)

20           After providing ample notice to his former employer, on Friday, April 1,

21   2011, Counsel Azadian joined The Mathews Law Group. (Azadian Decl. ¶ 7.)

22

---

23   [4]  Tellingly, Dealer-Sub avoided the opportunity to submit the work-product drafted by Counsel Azadian in the Student-Loan Action and also contends that it

24   was somehow precluded by the attorney-client privilege from filing Counsel Azadian's billing records. (<u>See</u> Mot. at p.2 n.1 ("The billing records are not

25   attached as they . . . are protected by the attorney-client privilege"). However, it is well settled that on a motion to disqualify, the appropriate procedure is to file

26   privileged or confidential documents under seal so that the court may review them <u>in camera</u>. <u>See</u> <u>Faughn v. Perez</u>, 145 Cal. App. 4th 592, 602 ("One method of

27   presenting evidence and protecting its confidential nature is to file the documents with the court under seal for <u>in camera</u> review"); <u>see also</u> <u>Morrison Knudsen Corp.</u>

28   <u>v. Hancock, Rothert & Bunshoft</u>, 69 Cal. App. 4th 223, 236 (1999) (detailed reports about pending cases prepared by counsel submitted for <u>in camera</u> review).

-4-

1    Between Friday and Monday, Counsel Azadian completed numerous tasks,

2    including drafting initial discovery for the Pennsylvania Action.  (Id. ¶ 8.)

3    Drafting initial discovery over the weekend is not an arduous task for Counsel

4    Azadian.[5]  (Id. ¶ 9.)  In fact, Counsel Azadian has been relied on to draft discovery,

5    motions and legal memoranda over a weekend and even shorter periods of time.

6    Moreover, Counsel Azadian was repeatedly informed that he had the highest

7    billable hours (approximately 2,800 hours annually) of any associate during his

8    entire two years with his former employer.  (Id. ¶ 10.)

9           On Monday, April 4, 2011, Counsel Azadian telephoned Counsel Troutman

10   to conduct a Rule 26(f) meet and confer.  Counsel Troutman misleadingly states in

11   his Declaration, "[i]t was quickly discovered that Counsel Azadian had previously

12   worded with the in house counsel assigned to" the TCPA Action.  (Troutman Decl.

13   ¶ 3.)  In reality, during his initial discussion with Counsel Troutman, Counsel

14   Azadian voluntarily disclosed that he had just started at The Mathews Law Group

15   and was previously an associate at Stroock.  (Azadian Decl. ¶ 11.)  During the

16   following week, Counsel Azadian made diligent efforts to contact Mr. Troutman

17   numerous times via email.  (Id. ¶ 12.)  However, Counsel Troutman repeatedly

18   stated that he was not ready to conduct a Rule 26(f) conference because he needed

19   to "solicit input from a few folks."  (Id. ¶ 13.)  Finally, on Friday, April 8, 2011

20   after repeated emails, Counsel Troutman changed the reasoning for his delay by

21   stating:

22
        Hi George
23      We're getting ahead of ourselves. Your case has a number of issues
        that we'll need to resolve before discovery. For instance, I'd like to
24      know more about your time at Stroock in Los Angeles defending
        Wells Fargo in class action cases. When did you leave Stroock and
25      when did you start? We can chat about all of this next week. Thanks.
26

---

27   [5] Counsel Troutman repeatedly insinuates that drafting discovery over a period
     three days is a remarkable task.  (Troutman Decl. ¶ 7; see also Mot. at 4:18-
28   19;12:10-11.)

**PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY
AND MOTION TO STRIKE**

-Eric

(Id. ¶ 14.)  Counsel Azadian promptly responded by with an email stating:

> Eric,
> Seeking to move the case forward and serving discovery is not "getting ahead of ourselves" at all.
> As for my work at Stroock, I was staffed on a single matter for Wells Fargo Bank, N.A., entitled <u>Sharon Cheslow v. Wells Fargo Bank, N.A.</u>, No. 10-cv-503 (ND Cal).  The case involved allegations that Wells Fargo improperly capitalized interest and settled prior to Well Fargo ever filing a response to the complaint.  Needless to say, I was not privy to any information that would even be remotely relevant to the current action against Wells Fargo Auto Finance for violations of the TCPA.
> I am not sure what are the other unspecified "number of issues" you contend must be resolved before discovery.  However, your repeated delaying tactics are getting the case off on the wrong foot.

(Id. ¶ 15.)

On Friday, April 12, 2011, despite being provided Plaintiff's cellular phone number weeks earlier, Counsel Troutman finally informed Counsel Azadian that the Pennsylvania Action was filed against the wrong entity (Wells Fargo Auto Finance) and the entity who placed the calls to Plaintiff was Dealer-Sub.  (Id. ¶ 16.)  Accordingly, the Pennsylvania Action was dismissed without prejudice and, on April 26, 2011, a modified complaint was re-filed against Dealer-Sub in the Central District of California giving rise to the instant Cell-Phone Action.

**D.    The Malta/Hopkins Actions Against Wells Fargo Home Mortgage, Inc.**

During his two years as an associate at Stroock, Counsel Azadian, at the request of his superiors, would send newly-filed complaints to Stroock's various contacts.  (Id. ¶ 5.)  These complaints would be obtained through a service that informed Stroock that such complaints had been filed.  (Id.)  On June 15, 2010 and June 18, 2010, at the direction of his superiors, Counsel Azadian sent complaints to Counsel Gausman alleging violations of the TCPA against Wells Fargo Home Mortgage, Inc and other unrelated entities (the "Malta/Hopkins Actions").  (Id.)

-6-

1   Both of these complaints were <u>publicly available</u> through the court's electronic

2   docket (PACER).  (<u>See</u> Def's RJN, Exs. 2-3.)  Counsel Azadian was not staffed on

3   either of these actions, did not work on these actions and did not receive, review or

4   otherwise discuss confidential information relating to these actions.  (Azadian

5   Decl. ¶ 6.)  The dockets for these actions reflect that Stroock only represented

6   Wells Fargo Home Mortgage, Inc. for less than three months prior to being

7   substituted by Counsel Troutman's firm on or before September 10, 2010.  (<u>See</u>

8   RJN, Ex. F; <u>see also</u> RJN, Ex. G.)  These actions against Wells Fargo Home

9   Mortgage, Inc. do not allege claims against Dealer-Sub or otherwise appear to

10   pertain to Dealer-Sub.  (<u>See</u> Def's RJN, Exs. 2-3.)

### III.  DEALER-SUB'S MOTION TO DISQUALIFY MUST BE OVERRULED.

**A.      <u>Legal Standard On A Motion To Disqualify</u>**

14         Disqualification in the present case turns upon the application of Rule 3-

15   310(E) of the Rules of Professional Conduct of the State Bar of California, which

16   provides, in pertinent part:  "A member shall not, without the informed written

17   consent of the . . . <u>former client</u>, accept employment adverse to the . . . <u>former</u>

18   <u>client</u> where, by reason of the representation of the . . . <u>former client</u>, the member

19   has <u>obtained confidential information material</u> to the employment."  (Emphasis

20   added.)

**1.  <u>Determining Whether The Attorney Owes A Duty Of Loyalty</u>**

22         The Motion argues that Counsel Azadian owes a duty to Dealer-Sub based

23   on his former representation of Bank-Sub.  (Mot. at 10:1-12:15.)  However, as a

24   general rule, an attorney only owes a duty to the specific corporate entity that it

25   actually represents.  <u>See</u> <u>Morrison Knudsen Corp. v. Hancock, Rothert &</u>

26   <u>Bunshoft</u>, 69 Cal. App. 4th 223, 227 (1999) ("in the representation of corporations,

27   it is the corporate entity actually represented, rather than any affiliated corporation,

28   which is the client") (<u>quoting</u> California State Bar Opinion No. 1989-113 ("State

-7-

1  Bar Opinion"), 1989 WL 25326).  There are two narrow exceptions that are

2  applicable in the wholly-owned subsidiary and parent corporation context, which

3  can result in treating two distinct entities as the "former client" for purposes of

4  Rule 3-310.  Id.

5    These exceptions are: (1) the "alter-ego" exception; and (2) the "unity of

6  interest" exception, both are discussed below in Section III.B.  See Faughn v.

7  Perez, 145 Cal. App. 4th 592, 611 (2006) (comparing alter ego and unity of interest

8  exceptions and "recognize[ing] that the discussions contained in the two published

9  decisions of the Court of Appeal on the question when a corporate affiliate should

10  be treated as a former client are not in complete harmony . . .").[6]  Critically, both

11  the alter-ego and unity of interest exceptions are based on two central facts:  (1) the

12  existence of a parent-subsidiary relationship; and (2) the action against a wholly

13  owned subsidiary threatened a relatively direct financial impact on the parent

14  corporation.  See e.g., Morrison Knudsen, 69 Cal. App. 4th at 236-46 (repeatedly

15  relying on "financial impact" to the parent corporation threatened by the lawsuit

16  against its wholly-owned subsidiary); Certain Underwriters at Lloyd's London v.

17  Argonaut Ins. Co., 264 F. Supp. 2d 914 (N.D. Cal. 2003) ("Unlike the indirect

18  stock devaluation example typical of parent-subsidiary relationships . . . the

19  financial prospects of [parent corporation] and [wholly owned subsidiary] are

20  much more closely linked" based on a "polling agreement" which requires the two

21  entities to "share premiums and liabilities").

22    **2.  Determining Whether A Conflict Of Interest Exists.**

23    If the court determines that a parent company and its wholly owned

24  subsidiary should be treated as a single entity for conflict of interest purposes, the

25

26  [6]  In Faughn, the court specifically left the question open regarding whether the "alter-ego" or "unity of interest" test was appropriate to the specific facts before the court.  See Faughn, 145 Cal. App. 4th at 612 ("because we have concluded that

27  moving party did not present sufficient evidence to satisfy the substantial relationship test in this case of successive representations, we need not reach the

28  question regarding which of the foregoing tests should be applied here").

**PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY
AND MOTION TO STRIKE**

1   next step is to determine whether the targeted attorney has a conflict of interest.

2   This requires the court to determine whether the Attorney "actually received" any

3   relevant confidential information or whether the attorney should be "presumed to

4   have received" relevant confidential information.  See Faughn, 145 Cal. App. 4th

5   at 603 ("In successive representation cases, a party may obtain the disqualification

6   of an attorney by establishing that the targeted attorney (1) has actual knowledge of

7   material confidential information or (2) is presumed to have acquired confidential

8   information because of the relationship between the prior representation and the

9   current representation.").  In order for an attorney to be "presumed" to have

10  received confidential information, there must be a "substantial relationship"

11  between the attorney's prior representation of the parent corporation and

12  subsequent representation adverse to the wholly-owned subsidiary. Id.  In

13  determining whether a "substantial relationship" exists, the court must analyze

14  both the legal and factual similarities between the two actions.  See id.; see also

15  Santa Teresa Citizen Action Group v. City of San Jose, 114 Cal. App. 4th 689, 711

16  (2003) ("even where the two representations involve the same general subject,

17  disqualification is not required if the nature of the factual and legal questions posed

18  are not similar") (emphasis added); Jessen v. Hartford Cas. Ins., 111 Cal. App. 4th

19  698, 713 (2003) ("successive representations will be 'substantially related' when

20  the evidence before the trial court supports a rational conclusion that information

21  material to the evaluation, prosecution, settlement or accomplishment of the former

22  representation given its factual and legal issues is also material to the evaluation,

23  prosecution, settlement or accomplishment of the current representation given its

24  factual and legal issues").

25  **B.**   **Dealer-Sub And Bank-Sub Should Not Be Treated As A Single Entity**

26  **For Conflict Of Interest Purposes.**

27         For multiple reasons, any one of which is sufficient to deny the Motion,

28  Dealer-Sub fails to demonstrate that Bank-Sub and Dealer-Sub should be treated as

-9-

1    a single entity for conflict of interest purposes.  Thus, for any one of the reasons

2    below, Counsel Azadian does not owe a duty of loyalty to Dealer-Sub and the

3    Motion must be denied.

4    **1. The Cases Relied On By Dealer-Sub Involve A Parent And Its**

5    **Wholly Owned Subsidiary – Not Distant Subsidiaries Of A Massive**

6    **Holding Company.**

7        Dealer-Sub argues that Bank-Sub and Dealer-Sub should be treated as the

8    same entity for conflict of interest purposes.  However, each of the cases relied on

9    by Dealer-Sub involve successive representations between a parent corporation and

10   its wholly owned subsidiary.  (See Mot. At pp. 10-11 (relying on Morrison

11   Knudsen and Certain Underwriters.)

12       Tellingly, Dealer-Sub fails to mention the fact that Bank-Sub and Dealer-

13   Sub do not share a parent-subsidiary relationship and are distant relatives of a

14   massive holding company comprised of 1,582 subsidiaries.  As evidenced by its

15   Annual Report, Holding Corp is involved in almost every aspect of global

16   commerce, including a plethora of banks, insurance entities, mortgage entities, title

17   entities, real estate entities, transportation entities, equipment entities, securities

18   holding companies, advisor entities, consultant entities, etcetera.  (See RJN, Ex. A

19   at p. 5.)  Unlike the incestuous parent-subsidiary relationships in Morrison

20   Knudsen or Underwriters, Bank-Sub and Dealer-Sub are merely affiliated by the

21   fact that they are both subsidiaries of Holding Corp.  Moreover, unlike the wholly

22   owned subsidiaries in Morrison Knudsen and Certain Underwriters, Dealer-Sub

23   does not even argue that Bank-Sub owns any interest whatsoever in Dealer-Sub.

24       Due to this glaring distinction, Dealer-Sub's reliance on Morrison Knudsen

25   and Certain Underwriters is completely misplaced.  Simply put, there is absolutely

26   no authority or logic in applying the unity of interest test to distant subsidiaries

27   such as Bank-Sub and Dealer-Sub.  If Dealer-Sub's faulty reasoning were accepted

28   as correct, an associate who works on a single matter during his time at a renowned

**PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY
AND MOTION TO STRIKE**

1  national law firm with numerous fortune 500 clients, must be disqualified in any

2  matter that is adverse to the other 1,580 subsidiaries that happen to share the same

3  massive holding company. See Adams v. Aerojet-General Corp., 86 Cal. App. 4th

4  1324, 1336-37 (2001) ("Any construction of rule 3–310(E) which would create an

5  ethical conflict based on that which is unknown to both the attorney and his new

6  firm would not only impair the attorney's freedom to change firms but would have

7  far-ranging disruptive repercussions on the client as well."). Thus, Dealer-Sub's

8  interpretation of Rule 3-310(E) lacks merit and the Motion must be denied.

9      **2.  Fatal To Dealer-Sub's Motion, The Cell-Phone Action Against**

10         **Dealer-Sub Will Not Result In Any Financial Impact To Bank-Sub.**

11      Dealer-Sub's Motion must also be rejected because it has failed to

12  demonstrate (or even address the issue) that there is no financial impact threatened

13  to Bank-Sub by the Cell-Phone Action against Dealer-Sub. See Morrison

14  Knudsen, 69 Cal. App. 4th at 240 ("if the lawsuit against the subsidiary were

15  successful, the outcome would have an adverse financial impact on the parent as

16  sole shareholder"). It is well settled that in order for the duty of loyalty to exist,

17  under either the unity of interest or alter-ego exception, the representation at issue

18  must threaten a financial impact on the corporate entity that was formerly

19  represented by the attorney. As explained by the court in Certain Underwriters:

20      [T]he financial impact of the instant litigation upon [parent] is more
        direct than in the usual parent-subsidiary relationship. To be sure,

21      various authorities have drawn a distinction between direct and
        indirect adverse consequences upon an existing client. See State Bar

22      Opinion, 1989 WL 253261, at *3 ("The attorney's duty of loyalty,
        however, extends only to adverse consequences on existing clients

23      which are 'direct.'"); see also id., at *3 (it is only indirectly adverse if
        "diminution in the value of the parent's stock in the subsidiary if the

24      attorney's suit against the subsidiary is ultimately successful."). See

25      also ABA Opinion at 1001:265-67; Restatement (3d) of the Law
        Governing Lawyers § 121 Comment d, p. 251 (2000) (lawyer's

26      obligation to the client extends to other entities "where financial loss

27

28

-11-

**PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY
AND MOTION TO STRIKE**

or benefit to the non-client person or entity will have a direct, adverse impact on the client.").

Certain Underwriters, 264 F. Supp. 2d at 922-23; see also id. at 923 ("Unlike the indirect stock devaluation example typical of parent-subsidiary relationships . . . the financial prospects of [parent corporation] and [wholly owned subsidiary] are much more closely linked" based on a "polling agreement" which requires the two entities to "share premiums and liabilities").

Here, unlike in Morrison Knudsen or Certain Underwriters, the Motion fails to argue that the Cell-Phone Action against Dealer-Sub will have any impact on Bank-Sub. Dealer-Sub has not argued that Bank-Sub even has an ownership interest in Dealer-Sub. On the other hand, there is substantial evidence proving that Bank-Sub will not be financially impacted by the action against Dealer-Sub. First, Holding Corp's Annual Report, concedes that federal regulations protect Bank-Sub from being forced to make payments to Dealer-Sub:

> [Holding Corp's] subsidiary banks are subject to restrictions under federal law that limit the transfer of funds or other items of value from such subsidiaries to [Holding Corp] and its nonbank subsidiaries (including affiliates) in so-called "covered transactions." In general, covered transactions include loans and other extensions of credit, investments and asset purchases, as well as certain other transactions involving the transfer of value from a subsidiary bank to an affiliate or for the benefit of an affiliate.

(RJN, Ex. A at p.10.) Second, the Annual Report goes on to disclose: "A bank's transactions with its nonbank affiliates are also generally required to be on arm's length terms." (Id. (emphasis added).) Based on the above disclosures, it is doubtful, if not impossible, that Dealer-Sub would be forced to seek funds from Bank-Sub in order to satisfy the damages sought by Plaintiff in this action. Even if the judgment obtained in the Cell-Phone Action bankrupts Dealer-Sub, Bank-Sub is a separate legal entity who has no liability whatsoever. Finally, in the extremely unlikely event that Dealer-Sub is somehow forced to obtain funds from Bank-Sub,

-12-

1    any such transaction must be "on arms length terms." (Id.) Thus, a loan from

2    Bank-Sub to Dealer-Sub must be on fair terms and would not be detriment to

3    Bank-Sub.

4         Instead of addressing this threshold issue in its exhausting Motion,

5    declarations or request for judicial notice, Dealer-Sub places its hopes on this

6    Court simply assume that the instant action against Dealer-Sub will have a

7    negative impact on Bank-Sub. See Faughn, 145 Cal. App. at 601("Sometimes,

8    omitted facts become conspicuous by their omission [cite], particularly where the

9    motion involved, like a motion to disqualify counsel, has the potential for tactical

10   abuse."). Accordingly, Dealer-Sub has completely failed to meet its burden of

11   proving that Bank-Sub and Dealer-Sub should be treated as a single entity for

12   conflict of interest purposes and the Motion must be denied.

13   **3.   Merely Sharing The Same Legal Department Does Not Give Rise To**

14        **A Unity Of Interest.**

15        It is well settled that a shared legal department cannot, by itself, create a

16   unity of interest between Bank-Sub and Dealer-Sub. Additional factors, including

17   a "relatively direct financial impact" are necessary. See Certain Underwriters, 264

18   F. Supp. 2d at 924 ("the combination of the two factors —(1) the relatively direct

19   financial relationship between [parent] and [wholly owned subsidiary] as a result

20   of the pooling agreement and (2) the common management, including supervision

21   over the legal affairs of both entities at issue in the two suits in which [attorney] is

22   involved— mandate the conclusion that the two should be treated as one entity for

23   purposes of analyzing the conflict of interest.") (emphasis added); see also

24   Morrison Knudsen, 69 Cal. App. 4th at 236-46 (repeatedly relying on "financial

25   impact" to the parent corporation threatened by the lawsuit against its wholly-

26   owned subsidiary).

27        Simply put, the fact that a legal department is shared by 1,582 subsidiaries

28   does not, by itself, result in those subsidiaries being considered Counsel Azadian's

-13-

**PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY**
**AND MOTION TO STRIKE**

1    "former client." Moreover, the Declaration of Counsel Azadian filed under seal

2    sets forth the facts regarding the limited scope of his legal services to Bank-Sub

3    and even more limited interactions with Counsel Gausman, which cannot be

4    compared in any realistic manner to the services provided by the attorney in

5    Morrison Knudsen. Id. at 236 (personnel of parent company declared that, over a

6    period of six years, he had "received advice from [attorney] on the 'value' of cases,

7    'the upside and downside of settlement alternatives and the financial impact both

8    to [Morrison, its divisions and subsidiaries] and [their] underwriters under the

9    various scenarios.'"). Dealer-Sub has completely failed to establish any legitimate

10   reason for treating Bank-Sub and Dealer-Sub as a single entity for conflict of

11   interest purposes. Therefore, the Motion must be overruled.

12       **4. Dealer-Sub Also Fails To Satisfy The Alter-Ego Exception.**

13        In addition to failing to establish the unity of interest exception, Dealer-Sub

14   does not attempt to satisfy the alter-ego exception. Despite Counsel Troutman's

15   declaration that the alter-ego exception is "bad law" (Troutman Decl. ¶ 8), the

16   California Court of Appeals has repeatedly recognized the "alter-ego" exception.

17   See Faughn, 145 Cal. App. 4th at 611; see also Morrison Knudsen, 69 Cal. App.

18   4th at 252 ("The State Bar Opinion properly lists the alter ego test as only one

19   possible basis for equating affiliates in conflicts cases") (emphasis added);

20   Brooklyn Navy Yard Cogeneration Partners, L.P. v. Superior Court, 60 Cal. App.

21   4th 248 (1997) (denying motion to disqualify and holding that parent and

22   subsidiary corporations should be treated as the same entity only when one

23   corporation is the alter ego of the other); see also 1 Witkin, Cal. Proc. 5th (2008)

24   Attys, § 111, p. 154 ("A narrow exception to the rule that related corporations

25   should not be treated as the same entity for conflict purposes is the alter ego

26   exception.").

27        Here, Dealer-Sub has made no effort to prove that Bank-Sub and Dealer-Sub

28   satisfy the alter-ego exception. Dealer-Sub's omission is not surprising, especially

**PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY
AND MOTION TO STRIKE**

given the fact that the Cell-Phone Action against Dealer-Sub would not have any impact on Bank-Sub and that Dealer-Sub does not even argue that Bank-Sub holds an interest in Dealer-Sub.  Accordingly, Dealer-Sub has also failed to satisfy the alter-ego exception.

**C.**   **Even If Bank-Sub and Dealer-Sub Are Improperly Treated As A Single Entity, There Is No Conflict Of Interest.**

As discussed above, even if Bank-Sub and Dealer-Sub are deemed to be the same entity for conflict of interest purposes, Dealer-Sub still must demonstrate that Counsel Azadian:  (1) actually received confidential information relevant to the Cell-Phone Action; or (2) that the Student-Loan Action and Cell-Phone Action are "substantially related."  See Faughn, 145 Cal. App. 4th at 603 ("In successive representation cases, a party may obtain the disqualification of an attorney by establishing that the targeted attorney (1) has actual knowledge of material confidential information or (2) is presumed to have acquired confidential information because of the relationship between the prior representation and the current representation.").

**1.**  **Dealer-Sub Attempts To Impermissibly Impute Conflicts Of Other Attorneys At Counsel Azadian's Former Firm.**

It is well settled that the rule of "imputed conflicts" between members of a law firm only applies while an attorney is a member of the firm.  See Adams, 86 Cal. App. 4th at 1339-40 (reversing trial court's disqualification order and stating, "[d]isqualification based on a conclusive presumption of imputed knowledge derived from a lawyer's past association with a law firm is out of touch with the present day practice of law."); see also id. at 1340 ("[where] attorney did not personally represent the former client who now seeks to remove him from the case, the trial court should apply a modified version of the 'substantial relationship' test").

**PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY AND MOTION TO STRIKE**

1    Here, Dealer-Sub has not produced any evidence that Counsel Azadian

2    received any confidential information relating to the Malta/Hopkins Actions.

3    Instead, the Motion attempts to impute the conflicts of other attorneys at Counsel

4    Azadian's former firm onto Counsel Azadian.  (See Mot. at 9:8-10; see also id. at

5    9:23-25 requesting the Court to "infer" that Counsel Azadian received information

6    regarding the Malta/Hopkins Actions based on the work performed by other

7    associates); see also Gausman Decl. ¶¶ 9-10 (admitting that Counsel Azadian was

8    not staffed on the Malta/Hopkins Actions but suggesting that the court should

9    "presume" Counsel Azadian received confidential information from other

10   attorneys).)  However, it is impermissible for the court to infer through Dealer-

11   Sub's sheer speculation and unsupported assumptions that Counsel Azadian

12   received confidential information relating to the Malta/Hopkins Actions.  See

13   Adams, 86 Cal. App. 4th at 1336 ("We have seen the dawn of the era of the 'mega-

14   firm.' . . . Individual attorneys today can work for a law firm and not even know,

15   let alone have contact with, members of the same firm working in a different

16   department of the same firm across the hall . . . .") (emphasis added).

17       As a last-ditch effort, Dealer-Sub argues that the emailing of two publicly

18   available complaints, somehow resulted of Counsel Azadian "direct" involvement

19   in the Malta/Hopkins Actions.  (See Mot. at 8:1-16; see also Gausman Decl. ¶ 7 &

20   Exs. 1-2.)  Dealer-Sub's argument that the emailing of publicly available

21   complaints resulted in Counsel Azadian's direct involvement in the Malta/Hopkins

22   Action is, at best, disingenuous.  The simple facts are that Counsel Azadian was

23   not staffed on either of these actions, did not work on these actions and did not

24   receive, review or otherwise discuss confidential information relating to these

25   actions.[7]  (Azadian Decl. ¶ 6.)  If Counsel Azadian did any work whatsoever on the

---

26   [7] Dealer-Sub also fails to mention that the dockets for the Malta/Hopkins Actions
     reflect that Stroock represented Wells Fargo Home Mortgage, Inc. for less than
27   three months prior to being substituted by Counsel Troutman's firms on September
     10, 2010. (See RJN, Ex. F (Dkt No. 12); see also RJN, Ex. G (Dkt No. 13).)  Also,
28   these actions against Wells Fargo Home Mortgage, Inc. do not allege claims

**PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY**
**AND MOTION TO STRIKE**

1   Malta/Hopkins Actions, he would have billed his time for the work.  (Id.)

2   Accordingly, Counsel Azadian had no role in the Malta/Hopkins Actions, much

3   less any direct role.  See Faughn, 145 Cal. App. 4th at 611 ("we conclude that the

4   record does not establish [targeted attorney] had a sufficient connection with the

5   220 other cases his law firm handled [for parent corporation] to presume that he

6   acquired confidential information material to the present case [against wholly

7   owned subsidiary]") (emphasis added).

8      **2.**  **The Student-Loan Action And Cell-Phone Action Lack The**

9         **Necessary "Substantial Relationship."**

10      Even a cursory review of the complaints in the Student-Loan Action and

11  Cell-Phone Action demonstrates that there is no "substantial relationship" between

12  the factual and legal issues in the actions.  (See Def's RJN, Ex. 1.)  As discussed

13  above, the complaint in the Student-Loan Action alleged that Bank-Sub breached

14  the "interest capitalization provisions of the federal student loans that it makes"

15  and was not in any way related to Dealer-Sub, calls placed to cellular phones, or

16  the TCPA.  (Id., Ex. 1 at ¶ 1.)  Additional facts demonstrating the lack of any

17  substantial relationship between the Student-Loan Action and Cell-Phone Action

18  are included in the Declaration of George S. Azadian filed under seal.  (See

19  Azadian Decl. ¶¶ 2-4.)  Accordingly, Dealer-Sub has also failed to prove that the

20  Cell-Phone Action is legally or factually similar to the Student-Loan Action.  Thus,

21  Dealer-Sub's Motion must be dismissed.  See Santa Teresa Citizen Action Group,

22  114 Cal. App. 4th at 711 ("even where the two representations involve the same

23  general subject, disqualification is not required if the nature of the factual and legal

24  questions posed are not similar") (emphasis added).

25

26

27

28  against Dealer-Sub or otherwise appear to pertain to Dealer-Sub.  (See Def's RJN,
    Exs. 2-3.)

-17-

## IV.  DEALER-SUB'S MOTION TO STRIKE IS BASED ON MISGUIDED EVIDENTIARY OBJECTIONS AND MUST BE OVERRULED.

The Complaint contains quotations from Internet postings made by others who, like Plaintiff, are receiving autodialed calls from Dealer-Sub for debt they do not owe.  (See Comp. ¶ 23.)  These allegations are contained in the Complaint as additional support that the action may be maintained as a class action.  (Id.)  Curiously, Dealer-Sub attempts to strike these quotations on the basis that they are "unsubstantiated hearsay drawn from a source of questionable accuracy submitted in anonymous fashion."  (Mot. to Strike at 3:13-14.)

As a preliminary matter, a motion to strike is not the proper vehicle for such evidentiary objections.  See Anderson v. The CBE Group, No. 11-cv-245, 2011 U.S. Dist. LEXIS 42334, at **7-8 (N.D. Cal. Apr. 18, 2011) (rejecting motion to strike very similar Internet posting in a TCPA class action complaint and noting, "[t]he Court finds that the quoted paragraphs are not prejudicial, and that the evidentiary objections are misplaced as allegations in a complaint are not evidence").  Additionally, Dealer-Sub's argument must be rejected because the quotations provide factual support for Plaintiff's contention that others have suffered similar wrongs.  See Germain v. J.C. Penney Co., No. 09-cv-2847, 2009 WL 1971336, at *8 (C.D. Cal. July 6, 2009) (denying defendants motion to strike Internet postings and rejecting arguments that the posting were "unduly prejudicial and are not attributed to any specific author or source" because the Internet postings provided "factual support for Plaintiffs' contention that numerous other consumers suffered from similar actionable wrongdoing.").  Accordingly, the Internet posting contained in Paragraph 23 of the Complaint should not be stricken.

PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY
AND MOTION TO STRIKE

## V. CONCLUSION & REQUEST FOR EXTENSION BASED ON DEALER-SUB'S DELAYING TACTICS

For the above reasons, Dealer-Sub's Motion to Disqualify and Motion to Strike must be overruled.  Additionally, both motions were used to delay the action.  See Adams, 86 Cal. App. 4th at 1339-40 ("as courts are increasingly aware, motions to disqualify counsel . . . can be misused to harass opposing counsel [citation], to delay the litigation . . . it is widely understood by judges that attorneys now commonly use disqualification motions for purely strategic purposes"); see also RDF Media v. Fox Broadcasting, 372 F. Supp. 2d 556, 561 (C.D. Cal. 2005) ("Motions to strike are generally disfavored because of the limited importance of pleadings in federal practice and because it is usually used as a delaying tactic").  Thus, Plaintiff respectfully requests a 90-day extension on the deadline imposed by Local Rule 23-3 for the filing of Plaintiff's Motion for Class Certification.

Respectfully Submitted,

Dated:  June 20, 2011

THE MATHEWS LAW GROUP
CHARLES T. MATHEWS
GEORGE S. AZADIAN

By: /s/ Charles T. Mathews
Charles T. Mathews
Attorneys for Plaintiff
CLAUDIA JOHNSON

PLAINTIFF'S JOINT OPPOSITION TO MOTION TO DISQUALIFY
AND MOTION TO STRIKE